# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Stephen Gritzuk, ) | |
| ) | |
| Plaintiff, ) | C.A. No.: 2:16-cv-1076-PMD |
| ) | |
| v. ) | **ORDER** |
| ) | |
| GCA Education Services, Inc., GCA ) | |
| Services Group, Inc., and Erie Acquisition ) | |
| Holdings, Inc., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

This matter is before the Court on Defendant Erie Acquisition Holdings, Inc.'s ("Erie") motion to dismiss (ECF No. 5) and Defendants GCA Education Services, Inc. and GCA Services Group, Inc.'s (together "GCA") joint motion to transfer (ECF No. 18). For the reasons set forth herein, Erie's motion is granted and the Court defers its ruling on GCA's joint motion to transfer.

## BACKGROUND

This action arises out of a dispute over non-compete provisions contained in Plaintiff Stephen Gritzuk's employment agreement with GCA Services Group, Inc. and in his stock option agreement with Erie. Among other things, GCA is in the business of providing custodial and facilities management services. Gritzuk worked for GCA in operations and facilities management for specific sites in the educational sector, and he assisted with GCA's sales in that sector as well. Gritzuk provided notice to GCA that he intended to resign in early July 2015, completed two more weeks of employment with GCA, and resigned on July 23. After his resignation, Gritzuk was hired by Harvard Maintenance, Inc., which is also in the business of providing facilities management services. Gritzuk alleges that his employment with Harvard Maintenance does not involve any work in educational sector facilities. In February 2016,

Gritzuk received a letter from an attorney representing GCA stating that his employment with Harvard Maintenance violated the terms of his employment and stock option agreements. In this action, Gritzuk seeks a declaratory judgment that the provisions at issue are invalid and that Gritzuk need not terminate or modify his employment at Harvard Maintenance.

## PROCEDURAL HISTORY

Defendants removed this case on April 7, 2016. A week later, Erie filed its motion to dismiss for lack of personal jurisdiction. Gritzuk responded on May 2, and Erie replied on May 12. Then, on May 17, GCA filed a motion to transfer, to which Gritzuk responded on June 3. GCA filed a reply on June 13. Accordingly, these matters are ripe for consideration.

## DISCUSSION

As a court of limited jurisdiction, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), this Court must remain mindful of the fact that "[t]he validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties," *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) (citing *Stoll v. Gottlieb*, 305 U.S. 165, 171–72 (1938); *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 465 (1873)).

### A.  Personal Jurisdiction

The critical issue before the Court is the propriety of exercising personal jurisdiction over Erie. "[T]o validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied." *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and second, the exercise of personal jurisdiction must not "overstep the bounds" of the Fourteenth Amendment's Due Process Clause. *Anita's N.M. Style*

*Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 317 (4th Cir. 2000). South Carolina's long-arm statute has been construed to be coextensive with, and reach the outer limits allowed by, the Due Process Clause. *E.g.*, *ESAB Grp. v. Zurich Ins. PLC*, 685 F.3d 376, 391 (4th Cir. 2012). Therefore, the dual jurisdictional requirements collapse into the due-process analysis. *See id.* Accordingly, the scope of the inquiry is whether a defendant has "certain minimum contacts" with the forum, such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations and quotation marks omitted). "In determining the existence of minimum contacts, the [C]ourt is mindful that it must draw all reasonable inferences from both parties' pleadings, even if they conflict, in [Gritzuk's] favor." *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 722 (D.S.C. 2007).

The analytical framework for determining whether minimum contacts exist differs according to which species of personal jurisdiction—general or specific—is alleged. *See ESAB Grp. v. Centricut, Inc.*, 126 F.3d 617, 623–24 (4th Cir. 1997). In this case, Gritzuk only asserts a specific jurisdiction theory. A court may exercise specific jurisdiction over a defendant that has purposefully directed activities toward the forum state when the alleged injuries arise out of or relate to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985).

The Fourth Circuit has developed a three-part test to determine whether the exercise of specific personal jurisdiction in a particular case comports with due process: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)). "The requirement of

3

purposeful availment 'is not susceptible to mechanical application[,]'" and courts look to several "nonexclusive factors" to determine whether a defendant has purposefully availed itself of the privilege of conducting activities in the forum state. *Sonoco Prods. Co. v. ACE INA Ins.*, 877 F. Supp. 2d 398, 405 (D.S.C. 2012) (quoting *Consulting Eng'rs Corp.*, 561 F.3d at 278). Those factors are:

> (1) whether defendant maintains offices or agents in the forum state;
> (2) whether defendant owns property in the forum state;
> (3) whether defendant reached into the forum state to solicit or initiate business;
> (4) whether defendant deliberately engaged in significant or long-term business activities in the forum state;
> (5) whether the parties contractually agreed that the law of the forum state would govern disputes;
> (6) whether defendant made in-person contact with the resident in the forum state regarding the business relationship;
> (7) the nature, quality, and extent of the parties' communications about the business being transacted; and
> (8) whether the performance of contractual duties was to occur within the forum.

*Id.* at 406. These factors expound on the Supreme Court's emphasis on "the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Burger King*, 471 U.S. at 479 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 314 (1943)). "It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.*

Applying the above-listed factors, Gritzuk has not alleged that Erie maintains offices or agents in South Carolina or that Erie owns property in South Carolina. Erie's stock option agreement was also not offered to Gritzuk as an attempt to solicit or initiate business in South Carolina, and Erie has not directly engaged in significant or long-term business activities in

4

South Carolina.[1]  The parties contractually agreed that the law of Delaware would govern disputes about the option agreement, and Erie did not make in-person contact with Gritzuk in South Carolina.[2]  As for the parties' communications, Gritzuk has only discussed two letters sent to him by Erie's lawyers.  Those letters discuss Gritzuk's obligations under the employment and stock option agreements, and the second letter threatened legal action unless Gritzuk resigned his employment at Harvard Maintenance.  Finally, performance of Gritzuk's contractual duties under the stock option agreement is to occur wherever Erie or its subsidiaries conduct business.  Both GCA entities, Erie's subsidiaries, do conduct business in South Carolina.

Applying the Supreme Court's analysis in *Burger King*, Gritzuk has not alleged any kind of prior negotiations over this option agreement.  There is no dispute that Erie offered the stock option agreement to all of GCA's executive management in conjunction with a 2012 merger.  Erie contends the executives were aware that this agreement was non-negotiable.  No Erie representative is alleged to have negotiated the agreement with Gritzuk, much less to have entered or used South Carolina to do so.  Importantly, the terms of the agreement specify that Delaware law applies and that Gritzuk's obligations not to compete, solicit, or otherwise interfere with GCA's business are in effect anywhere that Erie or its subsidiaries do business.[3]  Gritzuk contends that Erie knew performance under the agreement would take place in South Carolina.  However, under the terms of the agreement, Gritzuk's performance of his contractual obligations could take place anywhere that Erie or its subsidiaries conduct business.  Thus, the

---

1.     The Court notes that GCA may well have engaged in significant or long-term business activities in South Carolina.  However, because Gritzuk has not alleged any reasons to pierce the corporate veil for purposes of jurisdiction, the Court is solely focused on Erie's contacts.

2.     Notably, Gritzuk does not allege that he signed the stock option agreement in South Carolina.

3.     The Court is not making any finding as to the validity of those provisions.  Rather, the Court is merely looking to the terms of the agreement for indicia of personal jurisdiction.

terms of the agreement also do not establish that performance would take place here.  Erie did not purposefully avail itself of the privileges and protections of South Carolina because, as this language shows, it was only interested in protecting its subsidiaries' footprints.  It had no particular interest in South Carolina.  In fact, the connection to South Carolina exists solely because Gritzuk chose to work for one of Erie's alleged competitors in South Carolina.  Because the Court concludes that Erie has not purposefully availed itself of the privileges and protections of South Carolina, there is no need for it to discuss the remaining due-process prongs.

In reaching its decision, the Court has looked to the Fourth Circuit's analysis of specific personal jurisdiction in the business contract context.  First, in *Consulting Engineers*, the Fourth Circuit held that a Colorado corporation did not purposefully avail itself of the privilege of doing business in Virginia.  561 F.3d at 279.  The Colorado corporation "did not have offices or employees in Virginia, nor did it own property there."  *Id.* at 280.  The corporation "had no on-going business activity in Virginia" and there were no in-person contacts with Virginia contained in the record.  *Id.*  Further, the contract was negotiated in Colorado, signed in Colorado, and included Colorado choice-of-law and choice-of-forum clauses.  *Id.*  Finally, the performance contemplated by the agreement would have occurred outside of Virginia.  *Id.*  The only contacts in *Consulting Engineers* were four telephone conversations and twenty-four emails that were all aimed at negotiating a non-disclosure agreement.

Many of the facts on which the *Consulting Engineers* court based its decision are identical to the facts in this case.  As for contacts, the twenty-eight communications exchanged in *Consulting Engineers* are far more substantial contacts than the two letters Erie's counsel sent to Gritzuk.  The only significant difference[4] in these two cases is that performance of the stock

---

4.   Erie also did not include a forum-selection clause in the stock option agreement, but the forum-selection clause did not play into the Fourth Circuit's analysis in *Consulting Engineers*.  *See* 561 F.3d at 281 n.11.

6

option agreement could take place in South Carolina, whereas performance of the agreement in *Consulting Engineers* would definitively take place in India and not Virginia. However, as discussed above, Gritzuk's performance of his obligations under the stock option agreement is not specifically tied to South Carolina. Rather, it includes any geographic location where Erie or its subsidiaries do business. As a result, performance of Gritzuk's obligations is not specifically targeted at South Carolina. Instead, because Gritzuk chose to work for one of Erie's competitors in South Carolina, Erie now seeks to enforce the stock option agreement here. In other words, the connection between South Carolina and Erie is merely incidental.

Next, the Court considered *Le Bleu Corp. v. Standard Capital Group, Inc.*, in which the Fourth Circuit held a contract between a California corporation and a North Carolina corporation did not establish personal jurisdiction over the California corporation in North Carolina. The Fourth Circuit stated that "[a] contract with a resident of a forum state does *not* automatically constitute sufficient contacts to support the forum's assertion of specific jurisdiction, even where the dispute arises from the contract." 11 F. App'x 377, 380 (4th Cir. 2001) (per curiam). Instead, "the *contract* must have a substantial connection with the State, so that the quality and nature of a defendant's relationship to the forum can in no sense be viewed as random, fortuitous, or attenuated." *Id.* (quoting *Burger King*, 471 U.S. at 479–80 (internal quotation marks omitted)).

In *Le Bleu Corp.*, a North Carolina corporation was seeking capital contributions and engaged a California corporation to serve as its financial advisor in connection with the financing. *Id.* at 378. The California corporation sent representatives to North Carolina to discuss the agreement and to view the North Carolina corporation's operations. *Id.* Later, the California corporation signed the agreement and mailed it to the North Carolina corporation. *Id.*

7

The North Carolina corporation then signed the agreement in North Carolina and mailed it back to California, along with a retainer fee. *Id.* at 379. As work under the agreement progressed, representatives of the California corporation took a draft memorandum to North Carolina for review. *Id.* at 380. Nonetheless, in spite of the in-person contacts and the mailed agreements, the Fourth Circuit held that the California corporation was not subject to specific personal jurisdiction in North Carolina. *See id.* at 381.

Like *Consulting Engineers*, in *Le Bleu Corp.* the Fourth Circuit again held that more contacts than are present in this case were insufficient to confer specific personal jurisdiction over the non-resident defendant. In *Le Bleu Corp.*, representatives of the California corporation traveled to the forum state and discussed the agreement at issue. Here, Gritzuk has presented no allegations that any Erie representative traveled to South Carolina in connection with the stock option agreement. Moreover, unlike in *Le Bleu Corp.*, Gritzuk has not alleged that he received any mailings or communications concerning the agreement in this case until he received the two letters from Erie's counsel.

Finally, although not identical, this Court's decision in *Informaxion Solutions, Inc. v. Vantus Group* is informative. No. 2:15-cv-290-PMD, 2015 WL 7184562 (D.S.C. Nov. 10, 2015). The two cases are slightly different for one reason—there has been no jurisdictional discovery in this case. Thus, Gritzuk is only required to make a prima facie showing of jurisdiction, rather than the heightened standard used after jurisdictional discovery or a hearing has been conducted. *Id.* at *2 (citing *Estate of Thompson v. Mission Essential Pers., LLC*, No. 1:11CV547, 2014 WL 4745947, at *2 (M.D.N.C. Sept. 23, 2014). However, that distinction makes no difference in this case. In *Informaxion Solutions*, the non-resident defendant did not have offices or agents in South Carolina, nor did it own property or solicit business in South

8

Carolina. Moreover, the agreement in *Informaxion Solutions* stated that the law of Virginia would govern, and the only alleged contacts were a single phone call and a LinkedIn request. Finally, although it was unclear whether performance of the agreement in *Informaxion Solutions* actually took place in South Carolina, it was clear that the non-resident defendant was unaware that performance would take place here.

Again, Erie's sole contacts with South Carolina were the stock option agreement and the letters sent to Gritzuk by Erie and GCA's counsel. As in *Informaxion Solutions*, the Court cannot find that those contacts were sufficient to establish specific personal jurisdiction over Erie. Even giving Gritzuk the benefit of all inferences, the Court cannot conclude that these contacts establish the substantial connection required for specific personal jurisdiction.

Gritzuk has failed to make a prima facie showing of specific personal jurisdiction over Erie because the contacts Gritzuk has alleged are simply insufficient under the factors considered by the Fourth Circuit. Additionally, Gritzuk has not provided, nor is the Court aware of, any authority authorizing specific personal jurisdiction in a factually similar case. Based on the above analysis, the Court must grant Erie's motion to dismiss.

### B.     Motion to Transfer Venue

Having granted Erie's motion to dismiss, the Court must now consider GCA's motion to transfer to an alternative venue. GCA contends that this Court should transfer the case to the United States District for the Western District of Tennessee pursuant to 28 U.S.C. § 1404(a). The crux of GCA's argument in favor of transfer is that both GCA and Erie are subject to jurisdiction in Tennessee. Thus, GCA contends that the court in Tennessee could adjudicate all of these claims in a single proceeding. Alternatively, Gritzuk could continue with this suit against GCA and file another suit against Erie in some other appropriate court. The Court is

concerned with a third possibility—namely that Erie may be an indispensable party to this litigation under Federal Rule of Civil Procedure 19. In that event, the Court could be required to either retain or dismiss the action, with no option to transfer.[5] The Court requests that the parties brief the issue of whether Erie is an indispensable party under Rule 19 and, assuming that Erie is an indispensable party, discuss whether the action should proceed in Erie's absence.[6] The parties shall have five business days to submit their briefs on those issues, and another three business days to file a response.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Erie's motion to dismiss is **GRANTED** and the Court defers its ruling on GCA's motion to transfer until the parties have briefed the remaining issues.

**AND IT IS SO ORDERED.**

*[signature]*
PATRICK MICHAEL DUFFY
United States District Judge

**June 28, 2016**
**Charleston, South Carolina**

---

5. "Once the court determines that an absentee is necessary, or, in current Rule terms, is a 'required party[,]' . . . but that joinder of the absentee is not feasible . . . the court has only two options: it may proceed with the pending litigation or it may dismiss the case." 4 James Wm. Moore et al., Moore's Federal Practice § 19.05 (3d ed. 2015).

6. The Third Circuit has held that district courts should not dismiss *sua sponte* without giving the parties an opportunity to be heard and address the Court's concerns. *See Huber v. Taylor*, 532 F.2d 237, 249 (3d Cir. 2008).